# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                     No. CR 14-3523 JB

ALBERTO LUNA-JASSO,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before Court on the Defendants' Sentencing Memorandum, filed January 5, 2015 (Doc. 20)("Sentencing Memo.").[1]   The Court held a sentencing hearing on January 26, 2015. The primary issue is whether the Court should sentence Defendant Alberto Luna-Jasso to a sentence within the Sentencing Guidelines range, or should depart or vary. Because Luna-Jasso's cultural assimilation does not warrant a downward departure, because a Guidelines sentence will not result in disparate treatment between similarly situated defendants, and because a Guidelines sentence will result in adequate deterrence, the Court will sentence Luna-Jasso to the low end of the Guidelines range by sentencing him to 18-months imprisonment.

## FACTUAL BACKGROUND

The Court takes its facts from the Presentence Investigation Report, disclosed December 18, 2014 ("PSR"), which the United States Probation Office ("USPO") prepared.  On January 26, 2013, Immigration and Customs Enforcement ("ICE") agents found Luna-Jasso at the Bernalillo

---

[1]The Plaintiff United States of America did not file its own sentencing memorandum, but, instead, merely responded to Defendant Alberto Luna-Jasso's Sentencing Memo.  See United States' Response to Defendant's Sentencing Memorandum, filed January 8, 2015 (Doc. 21).

County, New Mexico, Metropolitan Detention Center, where Luna-Jasso was being held for unrelated charges.  PSR ¶ 5, at 3; id. ¶ 24, at 8-9 (stating that, on January 25, 2013, Luna-Jasso was arrested for aggravated stalking and for resisting, evading, or obstruction an officer).  The ICE agents interviewed Luna-Jasso and determined that he is a Mexico citizen.  See PSR ¶ 5, at 3.  The investigation determined that Luna-Jasso had previously been convicted of First Degree Burglary in the Superior Court of California in Las Angeles, California.  See PSR ¶ 6, at 3.  After that conviction and sentence, on July 2, 2003, Luna-Jasso was removed from the United States.  See PSR ¶ 6, at 3.

## PROCEDURAL BACKGROUND

Luna-Jasso was charged with unlawfully reentering the United States in violation of 18 U.S.C. §§ 1326(a)(1), (b)(2).  See Criminal Complaint at 1, filed July 18, 2014 (Doc. 1).  He pled guilty on October 16, 2014.  See Plea Minute Sheet Before the Honorable Kirtan Khalsa, United States Magistrate Judge, filed October 16, 2014 (Doc. 18).  The PSR recommends a sentencing range of 18- to 24-months imprisonment.  See PSR ¶ 53, at 15.

### 1.      The PSR's Calculations.

The PSR notes that the base offense level for reentry of a removed alien is 8.  See PSR ¶ 11, at 7.  The PSR states that an additional 8 offense levels are added for a prior conviction of an aggravated felony and subsequent removal from the United States pursuant to U.S.S.G. § 2L1.2(b)(1)(C).  See PSR ¶ 12, at 7.  The PSR notes a 2-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a) and a 1-level reduction for timely notifying the authorities of his intention to enter a guilty plea pursuant to U.S.S.G. § 3E1.1(b).  See PSR ¶¶ 18-19, at 7.  The PSR states that the resulting total offense level is 13.  See PSR ¶ 20, at 8.

The PSR states that Luna-Jasso was convicted of stalking and first-degree burglary in Los Angeles in 1999.  See PSR ¶ 23, at 8.  The PSR notes that Luna-Jasso was sentenced to five years of incarceration and was removed to Mexico on June 14, 2001.  See PSR ¶ 23, at 8.  The PSR states that, on January 25, 2013, Luna-Jasso was convicted in Bernalillo County, New Mexico, for aggravated stalking and for resisting, evading, or obstructing an officer.  See PSR ¶ 24, at 8.  The PSR notes that Luna-Jasso received a total sentence for these two convictions of around two and a half years, and that one year and eight months were suspended for an actual term of incarceration of six months.  See PSR ¶ 24, at 8-9.  The PSR states that these convictions result in a criminal history score of 5 and a criminal history category of III.  See PSR ¶¶ 25-26, at 9.  The PSR recommends for an offense level of 13 and criminal history category of III an imprisonment range of 18- to 24-months imprisonment.  See PSR ¶ 53, at 15.

**2.      Luna-Jasso's Sentencing Memorandum.**

On January 5, 2015, Luna-Jasso filed his Sentencing Memo.  Luna-Jasso discusses the hardships from his childhood, including abject poverty and an abusive drunkard for a father.  See Sentencing Memo. at 1-2.  Luna-Jasso asserts that, when he was fifteen years old, he left school to help provide for his family, and that, when he was sixteen years old, he left Mexico to find work in the United States.  See Sentencing Memo. at 2.  Luna-Jasso argues that the factors in 18 U.S.C. § 3553(a) call for a sentence below the Guidelines range.  See Sentencing Memo. at 2-14.  First, he contends that the nature of the offense, his history, and his characteristics warrant a lower sentence.  See Sentencing Memo. at 2-10.  Luna-Jasso asserts that he struggles will alcohol abuse, because he tries to emulate his father, and that, when he is not drunk, he has been a model husband and father.  See Sentencing Memo. at 2.  Luna-Jasso contends that his two

felony convictions stem from his unwillingness to let go and move on when women in his life end their relationships with him.  See Sentencing Memo. at 2-3.

Luna-Jasso contends that acculturation can lead to a departure or a variance in illegal reentry cases.  See Sentencing Memo. at 4.  He asserts that, before and after United States v. Booker, 543 U.S. 220 (2005), district courts regularly departed downwards in reentry cases, and that the United States Sentencing Commission amended U.S.S.G. § 2L1.2 in 2001 to reduce the rate of downward departures in immigration offenses, see Sentencing Memo. at 4-5.  Luna-Jasso argues that, even after the 2001 amendments, district courts still find that the Guidelines sentences for illegal reentry cases are excessive.  See Sentencing Memo. at 5.  He contends that, in 2006, because of the United States' motions, and because of courts' determinations, 36.5% of sentences in reentry cases were below the Guidelines range.  See Sentencing Memo. at 5. Luna-Jasso argues that this downward-departure trend shows that the Guidelines do not adequately reflect § 3553(a)'s sentencing goals.  See Sentencing Memo. at 5-6.  He also contends that cultural assimilation is grounds for departing downward and that continuous residency since childhood is the primary factor that the Court should consider.  See Sentencing Memo. at 6-7. Luna-Jasso assets that he came to the United States as a teen, that he has attended school in the United States, that his children live in the United States, and that most of his relatives live in the United States.  See Sentencing Memo. at 6-7.  He also asserts that many friends, relatives, and employers have come forward to attest to his character to show that his prior convictions are not representative of who he is.  See Sentencing Memo. at 8-10.

Luna-Jasso contends that his sentence does not need to be more than a year to adequately deter him from committing another offense.  See Sentencing Memo. at 10.  He notes that the

Department of Justice ("DOJ") has published a pamphlet listing five things to consider about

deterrence.  See Sentencing Memo. at 10-11.  These include:

1.  **The certainty of being caught is a vastly more powerful deterrent than the punishment.**  Research shows clearly: If criminals think there's only a slim chance they will be caught, the severity of punishment -- even draconian punishment -- is an ineffective deterrent to crime.

2.  **Sending an offender to prison isn't a very effective way to deter crime.**  Prisons are good for punishing criminals and keeping them off the street, but prison sentences are unlikely to deter future crime.  Prisons actually may have the opposite effect: Inmates learn more effective crime strategies from each other, and time spent in prison may desensitize many to the threat of future imprisonment.

3.  **Police deter crime by increasing the perception that criminals will be caught and punished.**  The police deter crime when they do things that strengthen a criminal's perception of the certainty of being caught.  Strategies that use the police as "sentinels," such as hot spots policing, are particularly effective.

4.  **Increasing the severity of punishment does little to deter crime.**  Laws and policies designed to deter crime are ineffective partly because criminals know little about the sanctions for specific crimes.  Seeing a police officer with handcuffs and a radio is more likely to influence a criminal's behavior than passing a new law increasing penalties.

5.  **There is no proof that the death penalty deters criminals.**  According to the National Academy of Sciences, "Research on the deterrent effect of capital punishment is uninformative about whether capital punishment increases, decreases, or has no effect on homicide rates."

National Institute of Justice, National Institute of Justice: Five Things About Deterrence, United

States Department of Justice, filed January 5, 2015 (Doc. 20)("Five Things").

Luna-Jasso also argues that a long sentence is unnecessary to protect the public, because

he will be deported after his incarceration, and because he has been forced to be sober for several

months because of his immigration detainer.  See Sentencing Memo. at 11.  He contends that

incarceration should not be imposed as a means of rehabilitation.  See Sentencing Memo. at 12.

Finally, he contends that the Guidelines range would create disparate sentences between similar

offenders.  See Sentencing Memo. at 12-14.  He notes that the United States denied him a fast-track disposition, which causes his offense level to be 4 levels higher than if he were granted a fast-track disposition.  See Sentencing Memo. at 12.  Luna-Jasso contends that, while he has been arrested for simple battery, he has never been arrested for a more severe crime.  See Sentencing Memo. at 12-13.

Luna-Jasso contends that there a number of factors warranting a lower-than-Guidelines sentence, including: (i) the denial of a fast track; (ii) good character; (iii) being a caring father; (iv) the criminal history category III over-represents  his danger to society; and (v) that he has lived in the United States his entire adult life.  See Sentencing Memo. at 14.

**3.      The United States' Response.**

The United States responded to the Sentencing Memo. on January 8, 2015.  See United States' Response to Defendant's Sentencing Memorandum, filed January 8, 2015 (Doc. 21)("Response").  The United States argues that, in determining whether a downward departure for cultural assimilation is appropriate, the Court should consider: (i) the age of the defendant when he or she began residing in the United States; (ii) whether and for how long the defendant attended school in the United States; (iii) the duration of the defendant's continued residence in the United States; (iv) the duration in which the defendant resided outside the United States; (v) the nature and extend to the defendant's familial and cultural ties inside the United States; (vi) the seriousness of the defendant's criminal history; and (vii) whether the defendants engaged in criminal activities after illegally reentering the United States.  See Response at 2.  The United States contends that these factors counsel against departing downward in this case, because Luna-Jasso came to the United States when he was 16 years old, and because most of his schooling took place in Mexico.  See Response at 2.  The United States asserts that Luna-Jasso

has family in Mexico.  See Response at 2.  It further asserts that, while Luna-Jasso has two adult children, they live with their mothers in California and that Luna-Jasso is not on favorable terms with them.  See Response at 3.  As to criminal history, the United States contends that Luna-Jasso has a history of violence, as his many arrests and convictions show.  See Response at 3-4. The United States asserts that it did not offer Luna-Jasso a fast-track disposition, because of his violent criminal history.  See Response at 5.

The United States argues that, while Luna-Jasso has two children in the United States, one is an adult, whom Luna-Jasso has not seen in four years, and the other lives in California with her mother.  See Response at 6.  The United States maintains that a Guidelines sentence is necessary to promote respect for the law, provide adequate deterrence, and protect the public. See Response at 6.  Finally, the United States asserts that imposing a Guidelines sentence is the best way to prevent unwarranted sentencing disparities between similarly situated defendants. See Response at 7.

**4.      Luna-Jasso's Reply.**

Luna-Jasso replied to the Response on January 15, 2015.  See Reply to Response to Sentencing Memorandum, filed January 15, 2015 (Doc. 22)("Reply").  Luna-Jasso argues that the United States merely addresses whether the Court should depart from the Guidelines for cultural assimilation and not whether the Court should vary.  See Reply at 1.  He contends that the United States' facts from the PSR are incorrect, because his daughter and her mother live in Albuquerque, New Mexico, and not in California.  See Reply at 1.  He contends that, because his first conviction occurred over sixteen years before this case was filed, his criminal history category over represents his dangerousness.  See Reply at 2.  Luna-Jasso argues that, because he will be deported after his sentence, because the only violence that occurred was done to property,

because no one was injured as a result of his offense, and because his convictions involved his love for his family and inability to let them go, a Guidelines sentence would be excessive.  See Reply at 3-4.

5.        January 26, 2015, Sentencing Hearing.

The Court held a sentencing hearing on January 26, 2015.  See Transcript of Hearing (taken January 26, 2015)('Tr.").[2]  Luna-Jasso repeated many of his arguments from the Sentencing Memo.  See Tr. at 3:9-23 (Converse); id. at 4:3-5:5 (Converse); id. at 5:6-6:10 (Converse).  He also contended that he has only been convicted of three felonies and not four, because one of the convictions was a misdemeanor.  See Tr. at 3:25-4:3 (Converse).  Luna-Jasso addressed the Court and said:

> Your Honor, I just want to apologize for my behav[ior].  I want to apologize for --
> I know alcohol brought me to a lot of problems in my life.  Me getting drunk, you
> know, I'm a different person and I apologize for me to come back to this country.
> I never meant to hurt nobody.  I just want another opportunity to be able to be
> there for my daughter when she grows up and be a father to my childrens [sic].
> Thank you, Your Honor.

Tr. at 7:1-9 (Luna-Jasso).  The Court applied the factors from 18 U.S.C. § 3553(a) and sentenced Luna-Jasso to the low end of the Guidelines range by imposing a sentence of 18-months imprisonment.  See Tr. at 10:1- 15:23 (Court).

LAW REGARDING THE UNITED STATES SENTENCING GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act of 1984, Pub. L. No. 98-473, 98 Stat. 1837, thus making the Guidelines sentencing ranges effectively advisory. See 543 U.S. at 245.  In excising the two sections, the Supreme Court left the remainder of the

---

[2]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable." 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> **(B)** to afford adequate deterrence to criminal conduct;
>
> **(C)** to protect the public from further crimes of the defendant; and
>
> **(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551. To achieve these purposes, 18 U.S.C. § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the nature of the offense and the defendant's character; (iii) the available sentences; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims. See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines ranges are no longer mandatory, both the Supreme Court and the United States Court of Appeals for the Tenth Circuit have clarified that, while the Guidelines ranges are one of several factors that 18 U.S.C. § 3553(a) enumerates, they are entitled to

considerable deference.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many"), overruled on other grounds by Gall v. United States, 525 U.S. 38 (2007), as recognized in United States v. White, 265 F. App'x 719, 728 n.8 (10th Cir. 2008)(unpublished).  They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses."  United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted).  A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable."  United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. 338, 349 (2007), as recognized in United States v. Zamora-Solorzano, 528 F.3d 1247, 1251 n.3 (10th Cir. 2008).  This presumption, however, is an appellate presumption, and not one that the trial court can or should apply.  See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. 85, 90-91 (2007).  Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the

advisory[3] Guidelines sentence.  See Rita v. United States, 551 U.S. at 351; Gall v. United States,

552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

_____

[3]Attorneys and courts often say that the "Guidelines" are advisory, but it appears more appropriate to say that the Guideline ranges are advisory.  Gall v. United States, 522 U.S. at 46 ("As a result of our decision [in United States v. Booker], the Guidelines are now advisory[.]"); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory.").  The Court must consider the Guidelines, see Gall v. United States, 522 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, see Gall v. United States, 522 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.").  The Court is not mandated, however, to apply a sentence within the calculated Guidelines range.  See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . .").  Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole.  The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

. . . .

The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted).  In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield.  In practice, however, appellate courts expect district courts to first

While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence. Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures. The sentencing court may, however, also use these same departure factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13, 2008)(Browning, J.). The Supreme Court recognized, however, that the sentencing judge is "in a superior position to find facts and judge their import under § 3553(a) in each particular case." Kimbrough v. United States, 552 U.S. at 89. Applying § 3553(a)'s factors, the Court has found that the case of an illegal immigrant who re-enters the United States to provide for his two children and two siblings was not materially differentiated from other re-entry cases, and, thus, no variance from the Guidelines sentence was warranted. See United States v. Alemendares-Soto, No. CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. Dec. 14, 2010) (Browning, J.). On the other hand, in United States v. Jager, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.), although the defendant's military service was not present to an unusual degree and, thus, did not warrant a departure, the Court found that a variance was appropriate, because the defendant's military service was "superior and uniformly

---

obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances." Irizarry v. United States, 553 U.S. 708, 710-16 (2008). A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably. See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

United States v. Nolf, No. CR 10-1919-002, 2014 WL 3377695, at *20-21 (D.N.M. June 20, 2014)(Browning, J.)(emphasis in original).

outstanding," as the defendant appeared to have been "trustworthy[] and dedicated, and he served with distinction."  2011 WL 831279, at *14.

## LAW REGARDING DOWNWARD DEPARTURES

The Guidelines "place essentially no limit on the number of potential factors that may warrant a departure."  Koon v. United States, 518 U.S. 81, 106 (1996).  See United States v. Coleman, 188 F.3d 354, 358 (6th Cir. 1999)(en banc)(stating that there are a "potentially infinite number of factors which may warrant a departure"); 18 U.S.C. § 3661 (stating that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence").  A departure is warranted if the case is "unusual enough for it to fall outside the heartland of cases in the Guideline."  Koon v. United States, 518 U.S. at 92.  Accord United States v. Lewellen, No. CR 11-1524 JB, 2012 WL 2175769, at *5 (D.N.M. June 5, 2012)(Browning, J.).

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.  We do not understand it to have been the congressional purpose to withdraw all sentencing discretion from the United States district judge.

Koon v. United States, 518 U.S. at 113.

## RELEVANT LAW REGARDING DOWNWARD DEPARTURE BASED UPON CULTURAL ASSIMILATION

In United States v. Serrata, 425 F.3d 886 (10th Cir. 2005), the United States Court of Appeals for the Tenth Circuit considered whether the district court abused its discretion in using a family-circumstances departure under U.S.S.G. § 5K2.0  to adjust the defendants' Guidelines

sentences.  See 425 F.3d at 911.  The Tenth Circuit articulated the standard it would use in its

review.

> This standard includes the following inquiries:
>
> (1)    whether the factual circumstances supporting a departure
>        are permissible departure factors;
>
> (2)    whether the departure factors relied upon by the district
>        court remove the defendant from the applicable Guideline
>        heartland thus warranting a departure,
>
> (3)    whether the record sufficiently supports the factual basis
>        underlying the departure, and
>
> (4)    whether the degree of departure is reasonable.
>
> United States v. Collins, 122 F.3d 1297, 1303 (10th Cir. 1997).  We have
> described the first inquiry as a legal question and the second as essentially a
> factual question.  Id.  We note that what constitutes a guideline's heartland is a
> legal question and our review on that question is not deferential.  Id. at 1303 n.4.

425 F.3d at 911-12.  The Tenth Circuit recognized that family circumstances are a discouraged

factor under the Guidelines[4] and "are not ordinarily relevant in determining whether a sentence

should be outside the applicable guideline range," unless the circumstances are present in "some

unusual or exceptional way."    United States v. Serrata, 425 F.3d at 913 (citations

omitted)(internal citation marks omitted).  See United States v. Marquez-Olivas, 172 F. App'x

855 (10th Cir. 2006)(unpublished)[5](indicating that "only in extraordinary circumstances may a

---

[4]Section 5H1.6 of the Sentencing Guidelines addresses the relevance of family
circumstances.  It states that "family ties and responsibilities are not ordinarily relevant in
determining whether a departure may be warranted."  U.S.S.G. § 5H1.6.  This provision did not
change in the November 1, 2010 Sentencing Guidelines.

[5]United States v. Marquez-Olivas is an unpublished opinion, but the Court can rely on an
unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See
10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited
for their persuasive value.").  The Tenth Circuit has stated:

defendant's cultural assimilation warrant" a departure from the Guideline range); United States

v. Bautista, 258 F.3d 602, 607 (7th Cir. 2001)(concluding that a downward departure on the

grounds of cultural assimilation "would be akin to one based on 'family ties' -- a discouraged

factor that is grounds for departure only in extraordinary circumstances").  The United States

Court of Appeals for the Ninth Circuit came to a similar conclusion in United States v. Lipman,

133 F.3d 726 (9th Cir. 1998).  In that case, the Ninth Circuit found that "a sentencing court may

depart on the basis of cultural assimilation if it finds that the defendant's circumstances remove

his case from the heartland of cases governed by the relevant individual guidelines and the

Guidelines as a whole."  133 F.3d at 731.

> Moreover, the factor of cultural assimilation is akin to the factor of "family and
> community ties" discussed under U.S.S.G. § 5H1.6.  Thus, to the extent that
> cultural assimilation denotes family and community ties, we hold that the district
> court has the authority to depart on this basis in extraordinary circumstances.
> Under U.S.S.G. § 5H1.6, "[f]amily ties and responsibilities and community ties
> are not ordinarily relevant in determining whether a sentence should be outside
> the applicable guideline range."  U.S.S.G. § 5H1.6.  But under U.S.S.G § 5K2.0,
> such circumstances may be relevant if "present to an unusual degree" such that
> the case is distinguished "from the 'heartland' cases . . . in a way that is important
> to the statutory purposes of sentencing."  U.S.S.G. § 5K2.0; see also United States
> v. Mondello, 927 F.2d 1463, 1470 (9th Cir. 1991)(holding that a court may rely
> on factors listed in U.S.S.G. § 5H1.1-.6 to justify a departure "in extraordinary
> circumstances").   Whether a defendant's family and community ties are
> sufficiently "unusual" or "extraordinary" to warrant departure in a particular case
> is a factual determination that also lies within the discretion of the district court.
> See [United States v.] Koon, 518 U.S. [81, 98]; see also U.S.S.G. § 5K2.0

---

> In this circuit, unpublished orders are not binding precedent, . . . and we have
> generally determined that citation to unpublished opinions is not favored.
> However, if an unpublished opinion or order and judgment has persuasive value
> with respect to a material issue in a case and would assist the court in its
> disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds that United
States v. Marquez-Olivas, United States v. Sanchez-Juarez, 240 F. App'x 259 (10th Cir.
2007)(unpublished), and United States v. Diaz-Devia, 425 F. App'x 764 (10th Cir.
2011)(unpublished), have persuasive value with respect to a material issue, and will assist the
Court in its disposition of this Memorandum Opinion and Order.

("Presence of any such factor may warrant departure . . . , under some
circumstances, in the discretion of the sentencing court.").

133 F.3d at 730.

The application notes to U.S.S.G. § 2L1.2 that became effective on November 1, 2010

contain a statement regarding departure based on cultural assimilation.  They state, in part:

> There may be cases in which a downward departure may be appropriate on
> the basis of cultural assimilation. Such a departure should be considered only in
> cases where (A) the defendant formed cultural ties primarily with the United
> States from having resided continuously in the United States from childhood,
> (B) those cultural ties provided the primary motivation for the defendant's illegal
> reentry or continued presence in the United States, and (C) such a departure is not
> likely to increase the risk to the public from further crimes of the defendant.
>
> In determining whether such a departure is appropriate, the court should
> consider, among other things, (1) the age in childhood at which the defendant
> began residing continuously in the United States, (2) whether and for how long
> the defendant attended school in the United States, (3) the duration of the
> defendant's continued residence in the United States, (4) the duration of the
> defendant's presence outside the United States, (5) the nature and extent of the
> defendant's familial and cultural ties inside the United States, and the nature and
> extent of such ties outside the United States, (6) the seriousness of the defendant's
> criminal history, and (7) whether the defendant engaged in additional criminal
> activity after illegally reentering the United States.

U.S.S.G. § 2L1.2, Application Note 9.

In  United States v. Hernandez-Del Villar, 785 F. Supp. 2d 986 (D.N.M.

2011)(Browning, J.), the Court refused to depart downward when the defendant came to the

United States when he was fifteen and when he had two teenage children and two grandchildren

in the United States.  See 785 F. Supp. 2d at 988.  The Court reasoned that, while a downward

departure was authorized, the defendants' circumstances did not "take him outside the heartland

of cases that" the Court sees on a regular basis, especially because the defendants "came to the

United States when he was fifteen, and his parents did not bring him here."  785 F. Supp. 2d

at 988.  In contrast, the Court granted a downward departure in United States v. Ochoa-Arrieta,

- 16 -

No. CR 11-2149 JB, 2012 WL 1596939 (D.N.M. Apr. 23, 2012)(Browning, J.), the Court granted a downward departure when the defendants' mother brought him to the United States when he was three, he attended public school in the United States for eleven years, English was his primary language, and all of his close family lived in the United States.  See 2012 WL 1596939, at *4.

## ANALYSIS

The Court will sentence Luna-Jasso to the low end of the Guidelines range. Luna-Jasso's cultural assimilation does not warrant a downward departure.  Additionally, a Guidelines sentence will not result in unwarranted disparities between similarly situated defendants, and a Guidelines sentence will provide adequate deterrence.  The Court will thus sentence Luna-Jasso to 18-months imprisonment.

## I.   LUNA-JASSO'S CULTURAL ASSIMILATION DOES NOT WARRANT A DOWNWARD DEPARTURE.

Luna-Jasso's cultural assimilation does not warrant a downward departure.  The Guidelines provide guidance on what circumstances warrant a cultural assimilation downward departure.

There may be cases in which a downward departure may be appropriate on the basis of cultural assimilation.  Such a departure should be considered only in cases where (A) the defendant formed cultural ties primarily with the United States from having resided continuously in the United States from childhood, (B) those cultural ties provided the primary motivation for the defendant's illegal reentry or continued presence in the United States, and (C) such a departure is not likely to increase the risk to the public from further crimes of the defendant.

In determining whether such a departure is appropriate, the court should consider, among other things, (1) the age in childhood at which the defendant began residing continuously in the United States, (2) whether and for how long the defendant attended school in the United States, (3) the duration of the defendant's continued residence in the United States, (4) the duration of the defendant's presence outside the United States, (5) the nature and extent of the defendant's familial and cultural ties inside the United States, and the nature and

extent of such ties outside the United States, (6) the seriousness of the defendant's criminal history, and (7) whether the defendant engaged in additional criminal activity after illegally reentering the United States.

U.S.S.G. § 2L1.2, Application Note 9.   The Court concludes that these factors show that the Court should not depart from the Guidelines sentencing range.   First, Luna-Jasso came to the United States when he was 16 years old.   See PSR ¶ 41, at 12.   The Court believes that a downward departure for cultural assimilation is more appropriate when a defendant initially entered the United States as a small child, and not as a teenager who is past many of his or her formative years.   As the Court has previously noted:

> The Court is seeing an increasing number of young people who come to the United States during their teenage years, while a few years ago, there were more defendants who came when they were two or three, spoke only English, were schooled in United States public schools and were as American as any United States citizen's children.   That latter category of children appear to be a better category for a departure than does Almendares-Soto, who came here when he was a teenager.

United States v. Almendares-Soto, No. CR 10-1922 JB, 2010 WL 5476767, at *10-11 (D.N.M. Dec. 14, 2010)(Browning, J.)(refusing to depart downward when the defendant entered the United States at age 15).   See United States v. Hernandez-Del Villar, 785 F. Supp. 2d at 988-89 (refusing to depart downward when the defendant entered the United States at age 15). Moreover, it is worth noting that Luna-Jasso came to the United Sates on his own volition and was not forced to come with his family or with others.   See PSR ¶ 41, at 13; Sentencing Memo. at 2.   Cf. United States v. Luna, No. CR 10-2239 JB, 2011 WL 831177, at *4 (D.N.M. Feb. 7, 2011)(Browning, J.)("Luna came here when he was fourteen with his mother and sister.   He did not know his father, and he had no real choice not to come.").   While the Court is hesitant to say that a person who enters the United States at sixteen could never qualify for a downward

departure, the age at which Luna-Jasso came to the United States counsels against departing. The first factor, thus, cuts against departing.

Second, while Luna-Jasso has attended some high school in Albuquerque, took three to four semesters of English as a Second Language in Santa Monica, California, and took plumbing and heating courses at Central New Mexico Community College, the vast majority of his schooling took place in Mexico. See PSR ¶ 48, at 14. Luna-Jasso received nine years of formal education in Mexico. See PSR ¶ 48, at 14. The amount of schooling he received in Mexico far outweighs the schooling he received in the United States, which cuts against departing downward.

Third, while Luna-Jasso has spent more time in the United States than in Mexico, it is not a significantly more amount of time. Luna-Jasso lived in the Mexico from 1968, when he was born, until around 1984, when he moved to California. See PSR ¶¶ 39, 41, at 12. It appears that he remained in the United States until he was convicted in 1999 of first-degree burglary and stalking. See PSR ¶ 23, at 8. He was then imprisoned from March 29, 1999, to June 14, 2001, when he was removed to Mexico. See PSR ¶ 23, at 8. From 2001 to 2003, Luna-Jasso went back and forth between the United States and Mexico, because ICE records show that he was removed from the United States on June 14, 2001; March 15, 2002; and July 8, 2003. See PSR ¶ 27, at 9. Luna-Jasso lived in the United States from 2003 until he was convicted in January 17, 2014, after which he was incarcerated. See PSR ¶ 24, at 8; id. at ¶ 41, at 12-13. Based on these dates, Luna-Jasso spent sixteen years in Mexico, three years incarcerated, two years going back and forth between Mexico and the United States, and twenty-five years in the United States. These twenty-five years in the United States, however, were not continuous, but were broken up into a fifteen-year period -- from 1984 to 1999 -- and a ten-year period -- from 2003 to 2014.

The place in which Luna-Jasso resided for the longest continuous period was Mexico -- from 1968 to 1984.  This factor, thus, either gives no weight to departing downward or slight weight in favor of not departing.  Similarly, the fourth factor cuts against departing, because Luna-Jasso has spent a significant, although not the majority, amount of his life in Mexico.

Fifth, while Luna-Jasso has family in both the United States and in Mexico, this factor cuts slightly towards departing downward.  Luna-Jasso has three siblings living in the United States and two living in Mexico.  See PSR ¶ 39, at 12.  Luna-Jasso has an adult son in California, to whom he has not spoken in four years.  See PSR ¶ 42, at 13.  He also has a four-year-old daughter who lives in Albuquerque.  See PSR ¶ 44, at 13.  While Luna-Jasso has family in Mexico, he has more family in the United States, and stronger familial ties with his family in the United States.  This factor, thus, cuts slightly toward departing downward.

Sixth, the seriousness of Luna-Jasso's criminal history calls for a Guidelines sentence.  Luna-Jasso has been convicted of three felonies and a misdemeanor.  See PSR ¶¶ 23-24, at 8-9.  He has also been arrested nine times.  See PSR ¶¶ 29-37, at 9-11.  Luna-Jasso attempts to lessen the seriousness of his convictions by arguing that they "involve his love for his family and inability to let them go when the women involved wanted to end the relationships."  Reply at 4.  See Sentencing Memo. at 2-3.  The Court is puzzled how this lessens the seriousness of the offenses.  While committing a crime because an obsession to keep a relationship that is on the fritz or finished may be seen as noble to some, in the Court's view, it increases the seriousness of the offense, not lessens it.  Luna-Jasso was convicted of stalking and attempting to burglarize his former girlfriend's apartment in 1998.  See PSR ¶ 23, at 8.  In 2013, he was convicted of stalking another girlfriend -- Luz Gamboa -- and of evading arrest.  See PSR ¶ 24, at 8.  In the 2013, conviction, Luna-Jasso threatened and intimidated Gamboa to keep her from reporting possible

child abuse or aggravated stalking allegations.  See PSR ¶ 24, at 9.  He then damaged the window of Gamboa's vehicle and resisted a Bernalillo County Deputy Sheriff in the lawful discharge of his duties.  See PSR ¶ 24, at 9.  That three of Luna-Jasso's convictions stem from offenses committed against those about whom he cared causes the offenses to be more severe, not less.  When a person commits a crime against a loved one or family member, the crime has more of an effect, because, in addition to the harm that the crime does, the victim also suffers from the harm which the betrayal and loss of trust causes.  The nature of Luna-Jasso's crimes makes them more, not less, severe, and this factor cuts in favor of not departing.

Seventh, Luna-Jasso committed more crimes after reentering the United States.  See PSR ¶ 24, at 8.  Consequently, this last factor also cuts in favor of not departing.  Accordingly, six factors cut against departing downward while one factor cuts slightly for departing downward.  Based on these factors, the Court concludes that a downward departure based on cultural assimilation is not warranted in this case.

## II.    18 U.S.C. § 3553(a)'S FACTORS DO NOT WARRANT A VARIANCE.

18 U.S.C. § 3553(a)'s factors do not warrant a variance.  In the Reply, Luna-Jasso argues that his cultural assimilation argument is for a variance and for a departure.  See Reply at 1.  In making this statement, Luna-Jasso cites to a portion of his Sentencing Memo. in which he discusses the disparate treatment between the Guidelines range and sentences from other reentry cases.  For the reasons stated on the record at the sentencing hearing, the Court will not vary because of cultural assimilation.  The Court will, however, address Luna-Jasso's arguments concerning disparate treatment, protection of the public, and deterrence.[6]

---

[6]Luna-Jasso also contends that he is a loving father to all of his children.  While Luna-Jasso's daughter lives in Albuquerque and he appears to have a relationship with her, his son lives in California, and Luna-Jasso has not talked to him in four years.  See PSR ¶ 42, at 13.

A.     A GUIDELINES SENTENCE DOES NOT RESULT IN DISPARATE
       TREATMENT.

A Guidelines sentence does not result in disparate treatment.  Luna-Jasso contends that

36.5% of reentry sentences imposed in 2006 were below the Guidelines range.  See Sentencing

Memo. at 5.  He argues that this high departure rate indicates that the Guidelines do not

adequately reflect the § 3553(a)'s factors and that a Guidelines sentence results in a sentence that

is greater than necessary.  See Sentencing Memo. at 5-6.  While a large number of reentry cases

result in lower-than-Guidelines sentences, the vast majority of these low sentences result from

the United States Attorney's Office's fast-track program.[7]

---

Moreover, Luz Gamboa's other children are not Luna-Jasso's biological children, but are
Gamboa's children from previous relationships, and Luna-Jasso never married Gamboa or
attempted to adopt her children.  See PSR ¶ 44, at 13.

[7]"To expedite the handling of large volumes of cases involving persons accused of
immigration offenses, certain judicial districts employ fast-track programs."  United States v.
Martinez-Trujillo, 468 F.3d 1266, 1268 (10th Cir. 2006), overruled by United States v.
Lopez-Macias, 661 F.3d 485 (10th Cir. 2011).  "In section 401(m)(2)(B) of the PROTECT Act
of 2003, Pub. L. No. 109–21, § 401(m)(2)(B), 117 Stat. 650, 675, Congress approved early
disposition or fast-track programs if certain conditions are met."  United States v. Rocha-Nunez,
No. 11-2848, 2012 WL 1372288, at *5 (D.N.M. Apr. 16, 2012)(Browning, J.).

        A provision of the PROTECT Act directed the United States Sentencing
        Commission to "promulgate . . . a policy statement authorizing a downward
        departure of not more than 4 levels if the Government files a motion for such
        departure pursuant to an early disposition program authorized by the Attorney
        General and the United States Attorney."  Pub. L. No. 108-21, § 401(m), 117
        Stat. at 675.  The Sentencing Commission accordingly added a new Guidelines
        section, effective October 27, 2003, authorizing such four-level departures.  See
        U.S.S.G. § 5K3.1, p. s.

United States v. Morales-Chaires, 430 F.3d 1124, 1127 (10th Cir. 2005)
        Originally, as the Tenth Circuit has stated: "The decision to adopt the [fast-track
program] in a district is made by the United States Attorney General and the United States
Attorney for the district."  United States v. Diaz-Devia, 425 F. App'x 764, 767 (10th Cir.
2011)(unpublished)(alterations in United States v. Diaz-Devia but not in source)(internal
quotation marks omitted)(citation omitted).  "In jurisdictions where fast-track programs have
been authorized by the Attorney General, defendants must agree to the factual basis of the

In 2013, across the nation, 27.5% of all re-entry defendants received a fast-track disposition pursuant to U.S.S.G. § 5K3.1 for immigration offenses.   See United States Sentencing Commission, Statistical Information Packet: Fiscal Year 2013 Tenth Circuit 19 ("2013 10th Cir. Stats.").   Not including below-Guidelines sentences under § 5K1.1 or for another United States' sponsored motion, another 3.8% of defendants received a downward departure below the Guidelines range, and another 8% received a below-Guidelines sentences. See 2013 10th Cir. Stats. at 19.  In the Tenth Circuit, in 2013, 30.1% of all re-entry defendants received a fast-track disposition for immigration offenses.  See 2013 10th Cir. Stats. at 19.  Not including below-Guidelines sentences under § 5K1.1 or for another United States' sponsored

---

criminal charge and waive the rights to file pretrial motions, to appeal, and to seek collateral relief (except for ineffective assistance of counsel)."  United States v. Morales Chaires, 430 F.3d at 1127 (alterations omitted)(internal quotation marks omitted).  The benefit to defendants under these programs is that they receive a shorter sentence, which is "accomplished either by charge-bargaining or by [the prosecutor] promising to recommend a downward departure at sentencing."  United States v. Morales-Chaires, 430 F.3d at 1127.   New Mexico is one of the States that has a fast-track program.  See United States v. Sanchez-Juarez, 240 F. App'x 259, 262 n.2 (10th Cir. 2007)(unpublished)("In any event, Sanchez-Juarez was prosecuted in the United States District court for the District of New Mexico, a jurisdiction that has a fast-track program in place.").  New Mexico also has a fast-track program for certain drug cases.  See R. Norris, Fast-Track Disparities in the Post-Booker World: Re-Examining Illegal Reentry Sentencing Policies, 84 Wash. U. L. Rev. 747, 757 n.67 (2006)(noting that a fast-track program covers "drug backpacking cases in New Mexico").

The United States Attorney General recently adopted a policy of implementing the fast-track program nationally for illegal re-entry cases.  See Memorandum from James M. Cole, Deputy Attorney General, to the United States Attorneys at 2 (Jan. 31, 2012), available at http://www.justice.gov/dag/fast-track-program.pdf ("Memorandum")("After consultation with the United States Attorneys in both affected and non-affected districts, the Department is revising its fast-track policy and establishing uniform, baseline eligibility requirements for any defendant who qualifies for fast-track treatment, regardless of where that defendant is prosecuted.").  The Attorney General stated that it would require certain "baseline eligibility requirements" for a particular district to maintain such a fast-track program, including: (i) having the United States Attorney in each district retain discretion to limit a defendant's participation in the program in light of various factors, such as criminal history and number of illegal re-entries; (ii) requiring a written plea agreement with certain provisions, such as an agreement to waive appellate rights; and (iii) setting national standards regarding what levels of downward departures are permitted under the program.  Memorandum at 2-4.

motion, another 0.8% of defendants in the Tenth Circuit received a downward departure below the Guidelines range, and 3.2% received a below-Guidelines sentences.  See 2013 10th Cir. Stats. at 19.  In New Mexico, in 2013, 25.9% of all re-entry defendants received a fast-track disposition for immigration violations.  See United States Sentencing Commission, Statistical Information Packet: Fiscal Year 2013 District of New Mexico 21 ("2013 D.N.M. Stats.").  Not including below-Guidelines sentences under § 5K1.1 or for another United States' sponsored motion, another 0.7% of defendants in New Mexico received a downward departure below the Guidelines range, and 1.5% more received a below-Guidelines sentences.  See 2013 D.N.M. Stats. at 21.  Even in 2005, the vast majority of below-Guidelines sentences for immigration violations were because of fast-track programs.  See United States Sentencing Commission, Statistical Information Packet: Fiscal Year 2005 Tenth Circuit 35 (noting that 19.5% of immigration violations across the nation resulted in fast-track dispositions).

The appearance of disparity in sentencing between Luna-Jasso's sentence and the large number of reentry defendants whom receive below-Guidelines sentences is not the result of courts departing because of § 3553(a)'s factors, but because the United States is offering fast-track dispositions in other cases and refusing to do so here.  If the Court were to depart or sentence outside the Guidelines, Luna-Jasso's sentence would create unwarranted disparities.  In the Tenth Circuit, 64.2% of defendants were sentenced within the Guidelines range for immigration offenses.  See 2013 10th Cir. Stats. at 18.  Not including § 5K1.1 departures, fast-track dispositions, or other United States' sponsored departures, the courts sentenced 4% of defendants below the Guidelines range for immigration offenses.  See 2013 10th Cir. Stats. at 19.  In New Mexico, 71.5% of defendants were sentenced within the Guidelines range for immigration offenses.  See 2013 D.N.M. Stats. at 18.  Not including § 5K1.1 departures,

fast-track dispositions, or other United States' sponsored departures, the courts sentenced 2.2% of defendants below the Guidelines range for immigration offenses.  See 2013 D.N.M. Stats. at 19.

Sentencing Luna-Jasso within the Guidelines range would be consistent with 64.2% of cases in the Tenth Circuit and 71.5% of cases in New Mexico.  If the Court were to sentence below the Guidelines, Luna-Jasso's sentence would be consistent with only 4% of cases in the Tenth Circuit and 2.2% of cases in New Mexico.  Sentencing Luna-Jasso below the Guidelines range would be inconsistent with over 95% of cases in the Tenth Circuit and in New Mexico.  Contrary to Luna-Jasso's contention, § 3553(a), thus, calls for a Guidelines sentence to prevent unwarranted disparity.   Accordingly, a Guidelines sentence does not create unwarranted sentencing disparities.[8]

Also, as the Court pointed out in United States v. Hernandez-Castillo, No. CR 06-1537 JB, 2007 WL 1302577 (D.N.M. Apr. 18, 2007)(Browning, J.), a non-fast-track defendant is not similarly situated to fast-track defendants.  See 2007 WL 1302577, at *8 ("Furthermore, the Court does not believe that Hernandez-Castillo is similarly situated to those defendants that enter into fast track agreements.  Unlike fast track defendants, Hernandez-Castillo retains his right to appeal and to collaterally attack his conviction.").  Fast-track defendants give up the right to appeal; non-fast-track defendants do not relinquish that right.  The Court has noted that this is a material difference.  Finally, while a fast-track plan is often offered, it is not always.  The United States has indicated that it might not offer a fast-track plea agreement when it is dealing with a defendant with an exceptional criminal history.  Criminal history is Luna-Jasso's problem.  Most

---

[8]Luna-Jasso's Guidelines sentence is a result of the United States' refusal to grant a fast-track disposition pursuant to U.S.S.G. § 5K3.1.  He has not, however, argued that the United States was wrong in refusing to move for such a disposition or that the United States was required to move for one.

people who receive a fast-track plea agreement do not have nearly the criminal history that Luna-Jasso has; accordingly, Luna-Jasso is not similarly situated to the people receiving fast-track plea agreements.

**B.     LUNA-JASSO'S CRIMINAL HISTORY CATEGORY DOES NOT OVER REPRESENT HIS DANGEROUSNESS.**

Luna-Jasso's criminal history category does not over represent his dangerousness. Luna-Jasso argues that, because his prior convictions were a result of "his desire to talk to his partners and attempt to keep his family together and work things out," because his most severe convictions occurred seventeen years ago, and because his most serious arrests has been for simply battery, his criminal history category over represents his dangerousness.   Sentencing Memo. at 12-13.  The Court disagrees.

Luna-Jasso has not argued that the USPO miscalculated his criminal history category. Instead, he contends that it does not reflect his dangerousness.  In calculating criminal history, the Guidelines focus more on the length of prior sentences for a prior conviction than on whether the prior conviction indicates the danger that the defendant poses to society.  For instance, a person convicted of multiple tax-evasion offenses would have a higher criminal history category than a person with a single murder conviction.  It would be hard to argue, however, that the tax evader is more dangerous than the murderer.  Luna-Jasso's dangerousness argument is thus unavailing, because the Guidelines criminal history category calculation is intended to take into account the culpability of the offender -- those who commit more crimes are deserving of more severe punishments -- and not necessarily the danger that the defendant poses to society.

Moreover, Luna-Jasso's criminal history indicates that he is dangerous.  In 1998, he stalked his former girlfriend and attempted to break into her apartment.  See PSR ¶ 23, at 8.  In 2013, Luna-Jasso again stalked his girlfriend and damaged her vehicle's window.  See PSR ¶ 24,

at 8-9.   He has been arrested numerous times for various suspected offenses, including threatening a witness, multiple incidents of inflicting corporal injury on his spouse, multiple incidents of battery, vandalism, and theft.   See PSR ¶¶ 30-37, at 10-11.   Luna-Jasso is not a passive, non-violent man who is not a potential danger to others.   Accordingly, the Court concludes that his criminal history category does not over represent his dangerousness.

Finally, a departure for overrepresentation may be appropriate when "reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes" -- not whether the defendant is not dangerous.   U.S.S.G. § 4A1.3(b)(1). Luna-Jasso has a severe alcohol problem.   He commits a lot of crimes.   He will be deported after he serves his sentence.   He will not receive substance treatment program.   There is little in the record to give the Court comfort that Luna-Jasso will cease coming to the United States, cease drinking, or cease committing crimes in the United States.   While Luna-Jasso may not be too dangerous, a criminal history category of III does not "substantially over-represent[] . . . the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3(b)(1).

## C.   THE DETERRENCE VALUE OF LUNA-JASSO'S SENTENCE CALLS FOR A GUIDELINES SENTENCE.

The deterrence value of Luna-Jasso's sentence calls for a Guidelines sentence. Luna-Jasso argues that a sentence that is less than a year would be sufficient to deter him from committing another offense.   See Sentencing Memo. at 10-11.   He attaches to the Sentencing Memo. a pamphlet that the DOJ published which lists five things to consider about deterrence. See Five Things at 1.   The pamphlet states:

1.   **The certainty of being caught is a vastly more powerful deterrent than the punishment.**   Research shows clearly: If criminals think there's only a

slim chance they will be caught, the severity of punishment -- even draconian punishment -- is an ineffective deterrent to crime.

2.    **Sending an offender to prison isn't a very effective way to deter crime.** Prisons are good for punishing criminals and keeping them off the street, but prison sentences are unlikely to deter future crime. Prisons actually may have the opposite effect: Inmates learn more effective crime strategies from each other, and time spent in prison may desensitize many to the threat of future imprisonment.

3.    **Police deter crime by increasing the perception that criminals will be caught and punished.** The police deter crime when they do things that strengthen a criminal's perception of the certainty of being caught. Strategies that use the police as "sentinels," such as hot spots policing, are particularly effective.

4.    **Increasing the severity of punishment does little to deter crime.** Laws and policies designed to deter crime are ineffective partly because criminals know little about the sanctions for specific crimes. Seeing a police officer with handcuffs and a radio is more likely to influence a criminal's behavior than passing a new law increasing penalties.

5.    **There is no proof that the death penalty deters criminals.** According to the National Academy of Sciences, "Research on the deterrent effect of capital punishment is uninformative about whether capital punishment increases, decreases, or has no effect on homicide rates."

Five Things at 1.

It should first be noted that this list does not represent the DOJ's views or opinions, as the pamphlet states that the "[f]indings and conclusions of the research reported here are those of the authors and do not necessarily reflect the official position or policies of the U.S. Department of Justice." Five Things at 1. In any case, the Court generally agrees with the first four points,[9] but

---

[9]The Court disagrees with the fifth point: that there is no proof that the death penalty deters criminals. While the death penalty may not act as an additional deterrent to certain abhorrent crimes -- such as especially gruesome murders -- it may act as a deterrent to protect certain classifications of victims. For instance, convicted bank robber, Matthews James Griffin, attempted to escape from prison by attacking a prison guard with a concealed blade. See Scott Sandlin, Ninja Bandit Settles Lawsuit, Albuquerque J. (Oct. 9, 2011, 12:05 a.m.), http://www.abqjournal.com/61839/news/ninja-bandit-settles-lawsuit.html. Griffin stated, during a deposition, that he was trying to merely maim the guard and not to kill him, because he would

still concludes that a longer sentence has some deterrence value that warrants a Guidelines sentence. The Court has previously noted that the certainty of being caught is a greater deterrence than the severity of the punishment and that incarceration increases recidivism rates. The Court, however, concluded that the severity of a punishment still has a general deterrence effect, even if it is not as great of a deterrence as the certainty of being caught.

> The Court distinguishes general deterrence -- the effect that a sentence has on deterring people other than the defendant from committing the crime -- from specific deterrence -- the effect that the sentence has on deterring the defendant from recidivating. The weight of the research indicates that incarceration -- imposing it at all or increasing the amount imposed -- either has no significant correlation to recidivism or increases the defendant's likelihood to recidivate. See, e.g., Lin Song & Roxanne Lieb, Recidivism: The Effect of Incarceration and Length of Time Served 4-6, Wash. St. Inst. for Pub. Pol'y (Sept. 1993), available at http://wsipp.wa.gov/ReportFile/1152/Wsipp_Recidivism-The-Effect-of-Incarceration-and-Length-of-Time-Served_Full-Report.pdf (summarizing available studies on the correlation between incarceration and recidivism); T. Bartell & L.T. Winfree, Recidivist Impacts of Differential Sentencing Practices for Burglary Offenders, 15 Criminology 387 (1977)(outlining the results of a New Mexico-based study and concluding that offenders placed on probation were less likely to be reconvicted than similarly situated offenders who were incarcerated); D.M. Gottfredson, M.G. Neithercutt, J. Nuttfield & V. O'Leary, Four Thousand

---

have received the death penalty if he had killed the guard. See Scott Sandlin. Additionally, during the 1980 New Mexico prison riots, while thirty-three inmates were murdered, every guard survived. See Albuquerque Journal Editorial Board, Editorial: Killer Confirms Death Penalty Was Deterrent, Albuquerque J. (Oct. 11, 2011, 12:05 a.m.), http://www.abqjournal.com/62094/opinion/killer-confirms-death-penalty-was-deterrent.html ("But there can be no debate that Edward Chavez and Marylyn Crawford and Todd Wilson and the guards on duty during the riot survived because killing them would have earned their attackers a death sentence."). This evidence suggests that the death penalty deterred the inmates from murdering the prison guards. Mark H. Donatelli, the New Mexico public defender who represented the inmates after the 1980 prison riots, disagrees. See Mark Donatelli, Death Penalty Doesn't Keep Guards Alive, Albuquerque J. (Oct. 16, 2011), http://www.abqjournal.com/63220/opinion/death-penalty-doesnt-keep-guards-alive.html. Mr. Donatelli argues that the inmates did not kill the prison guards, because they believed that the memories of the torture that the inmates inflicted on the guards would inflict a harm worse than death, because the inmates believed that the National Guard would open fire and slaughter the inmates if they killed the guards, or because the inmates respected the guards and did not want to kill them. See Mark Donatelli. In any case, even if the death penalty does not deter all prison inmates from killing prison guards, it deterred Griffin, and the prison guard that he attacked survived because of the possibility of receiving the death penalty.

Lifetimes: A Study of Time Served and Parole Outcomes, Nat'l Council on Crime & Delinquency (1973)(outlining the results of a study of over 100,000 male parolees and finding that similarly situated offenders who served longer periods of incarceration were more likely to recidivate than those who received shorter periods of incarceration); T. Orsagh & J.R. Chen, The Effect of Time Served on Recidivism: An Interdisciplinary Theory, 4 J. Quant. Criminology 155 (1988)(concluding that similarly situated robbery convicts' recidivism rates rose with rising length of incarceration, while burglars and some other criminals had a "sweet spot" length of incarceration -- 1.2 to 1.3 years for younger offenders and 1.8 years for older offenders -- deviations from which increased recidivism). This trend obtains even for white-collar criminals. See David Weisburd et al., Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes, 33 Criminology 587 (1995). Thus, specific deterrence is a suspect ground for increasing incarceration, except insofar as the offender will be prevented -- though not "deterred" in the usual sense -- from committing additional crimes while in custody for the longer time period. This concept, however, is distinct; it is referred to as incapacitation, and academics do not usually consider it to be a subcategory of specific deterrence. Professor Daniel Nagin explains:

> The distinction between incapacitation and deterrence is also important for policy. Crime prevention by incapacitation necessarily requires higher imprisonment rates and the attendant social costs. By contrast, if crime can be deterred from occurring in the first place, there is no perpetrator to punish. As a consequence, crime prevention by deterrence does not necessarily involve a trade-off between crime rates and imprisonment rates.

Daniel S. Nagin, Deterrence: A Review of the Evidence by a Criminologist for Economics, 2013 Annual Rev. Econ. 5:83, 84. Both specific deterrence and incapacitation are, of course, valid considerations in sentencing, and the difference between the two may be more important to academics than to courts. Courts are bound to impose sentences consistent with 18 U.S.C. § 3553(a), and both considerations -- specific deterrence and incapacitation -- are reflected in the same two § 3553(a) factors: (a)(2)(B)'s mandate "to afford adequate deterrence to criminal conduct" and (a)(2)(C)'s mandate "to protect the public from further crimes of the defendant." The Court concludes that specific deterrence is embodied more by (a)(2)(B) than (a)(2)(C), while incapacitation is embodied more by (a)(2)(C) than (a)(2)(B), but both statutory provisions support both considerations, and if Congress did not care to separate them, the Court must address them both when sentencing a defendant. Thus, the Court must still consider specific deterrence when sentencing, because Congress demands it; prevailing research simply indicates that alternatives to incarceration are generally more effective on this front.

There is, however, comparatively more support for incarceration's general-deterrence value. An economic model of crime would have individuals committing crimes only when the benefit to the individual of committing the

crime (*f*, for "fruits") outweighs the product of the likelihood of getting caught and brought to justice (*c*, for "certainty") multiplied by the detrimental impact of the punishment on the individual (*s*, for "severity"). If $f > c \cdot s$, the individual will commit the crime, and if $f < c \cdot s$, the individual will not commit the crime. The Court notes that this theory is not fully workable as written; several factors -- many of which would vary from person to person -- would need to be established. For example, *s* and *f* would have to be put into the same units. Commonly, *s*, the punishment for a crime, starts out in units of months of incarceration; *f*, the crime's benefit to the criminal, often starts out in units of dollars. A conversion factor would have to be established that essentially asks how much an individual would have to be paid to spend a month in prison. This conversion factor would likely vary from person to person, both on the basis of idiosyncratic personal preferences and for rational, predictable reasons, e.g., an 80-year-old man with millions of dollars might be less apt to trade prison time for money than a 30-year-old without a cent to his name. Even a single person likely has more than one conversion factor, which marginally fluctuates over the number of months of incarceration involved; for example, there are often immense social and reputational costs to a person for serving his or her first month in prison -- i.e., for being convicted and incarcerated at all -- but these costs are for the most part one-time-only, and do not double or triple upon serving two or three months in prison. The model would also have to account for: (i) the possibility of being arrested but not convicted, which might entail social and reputational costs, and even some jail time; (ii) the possibility of being suspected but not arrested, which may entail social and reputation costs; and (iii) the uncertainty, at the time the crime is committed, of what the exact punishment will be if convicted. These "intermediate" outcomes -- between the polar outcomes of being convicted, on one hand, and getting away scot free, on the other -- necessitate transforming the right-hand side of the model formula into an integral, in which the various possible outcomes are assigned a probability, their detrimental impact multiplied by that probability, and each possible outcome's consequent product added together to obtain a final sum, which represents $c \cdot s$. Analogous issues exist on the left-hand side of the formula -- the expected value of committing the crime. It is often not clear before committing the crime how much money -- or other non-monetary benefit, which can then be assigned a monetary equivalent -- will be earned by committing the crime, and, thus, the various possibilities and their corresponding likelihoods must be integrated.

    None of these snags is fatal to the economic model; they just make the model's inputs difficult to obtain, and, in some cases, practically unknowable. The model is theoretically sound, and accurately describes how an informed, rational actor would treat the decision whether to commit a crime. Even though most criminals are not, themselves, "informed, rational actors," one would expect that their behavior would, on average, reflect the rational pursuit of incentives, i.e., individuals who should not rationally commit crimes will commit them at roughly the same rate that individuals who "should" rationally commit crimes refrain from committing them, and thus the irrationalities in both directions cancel out, resulting in net rational behavior. Thus, under the economic model, all

Congress has to do to root out crime is to ensure that the crime's punishment and detection rate are sufficiently high to greatly outweigh the average fruits of the crime.  This end can be effectuated equally well with either severity of punishment or certainty of detection, as a proportional increase to either has the same effect on the right side of the equation.

The model, however, does not work in the real world; it has been falsified by empirical research.  The model is dead, and facts, not theory, killed it.  If the model held true in the real world, doubling the punishment severity of a crime would deter the same portion of potential criminals as doubling the certainty of detection, and halving a crime's punishment would galvanize the same number of new criminals and halving the detection rate.  For example, consider a crime with a certainty of 20% and a severity of 10 years, and assume that 100 people commit this crime.  Now assume that the certainty was raised -- by way of increased resources devoted to police, investigation, prosecution, etc. -- to 40%.  The number of people who commit the crime would go down from 100 to $x$.  This figure, $x$, is not a predictable number, i.e., it is not necessarily 50, because to determine $x$'s value one would have to know more about $f$, and where $c \cdot s$ stood in relation to it both before and after the certainty modification.  Now assume, instead, that the certainty was left at 20% but the punishment was raised from 10 years to 20 years.  The number of people who commit the crime would again go down from 100 to $x$, and, although $x$ would still be an unpredictable number, it would be the same number as the number of people who committed the crime when the detection rate was doubled.

An avalanche of criminological studies have determined that this theoretical symmetry between severity of punishment and certainty of detection does not exist in the real world.  See Isaac Ehrlich, Participation in Illegitimate Activities: A Theoretical and Empirical Investigation, 81 J. Pol. Econ. 521, 544-47 (1973)(finding that the certainty of punishment was a more important indicator than severity in deterring murder, rape, and robbery); Harold G. Grasmick & George J. Bryjak, The Deterrent Effect of Perceived Severity of Punishment, 59 Soc. Forces 471, 472 (1980)(reviewing twelve deterrence studies and explaining that "nearly all these researchers conclude that perceived certainty of legal sanctions is a deterrent, [while] only one (Kraut) concludes that perceptions of the severity of punishment are part of the social control process"); Jeffrey Grogger, Certainty v. Severity of Punishment, 29 Econ. Inquiry 297, 304 (1991)(studying California arrestees and concluding that "increased certainty of punishment provides a much more effective deterrent than increased severity" and that a "six percentage point increase in average conviction rates would deter as many arrests as a 3.6 month increase in average prison sentences"); Steven Klepper & Daniel Nagin, The Deterrent Effect of Perceived Certainty and Severity of Punishment Revisited, 27 Criminology 721, 741 (1989)(surveying graduate students about tax evasion scenarios and finding that certainty of punishment is an effective deterrent); Daniel S. Nagin, Criminal Deterrence Research at the Outset of the Twenty-First Century, 23 Crime & Just. 1, 13 (1998)(reviewing the literature and concluding that "cross-sectional and scenario-based studies have consistently found that perceptions of the risk of detection and

punishment have negative, deterrent-like associations with self-reported offending or intentions to offend"); Daniel S. Nagin & Greg Pogarsky, An Experimental Investigation of Deterrence: Cheating, Self-Serving Bias, and Impulsivity, 41 Criminology 167 (2003)(testing whether students would cheat on a trivia quiz to earn a cash bonus and finding that cheating decreased when the certainty of detection was higher but not when the perceived severity of punishment increased); Ann Dryden Witte, Estimating the Economic Model of Crime with Individual Data, 94 Q. J. Econ. 57, 79 (1980)(studying men released from the North Carolina prison system and demonstrating that "a percentage increase in the probability of being punished has a relatively larger effect on the number of arrests or convictions than does a percentage increase in the expected sentence"); Andrew von Hirsch et al., Criminal Deterrence and Sentence Severity: An Analysis of Recent Research 47 (1999); Robert Apel & Daniel S. Nagin, General Deterrence: A Review of Recent Evidence, in Handbook on Crime and Criminal Justice (Michael Tonry ed.)(2011); Alfred Blumstein & Daniel Nagin, The Deterrent Effect of Legal Sanctions on Draft Evasion, 29 Stan. L. Rev. 241, 269 (1977)(studying draft evasion and finding a significant negative association between the probability of conviction and the draft evasion rate, leading the authors to conclude that their "findings are consistent with the work of other investigators who have argued that the certainty of punishment has a stronger deterrent effect on crime than the severity of punishment"); Aaron Chalfin & Justin McCrary, Criminal Deterrence: A Review of the Literature, J. Econ. Literature (forthcoming). Studies universally find that certainty of punishment has a far greater deterrent effect than severity of punishment. It is difficult to pin down the extent to which real-world (empirical) findings deviate from the one-to-one rate predicted by the economic model -- i.e., whether certainty is twice as important, three times as important, or ten times as important -- as it appears to differ in different contexts. Interestingly, studies also agree that another factor, which is entirely absent from the economic model, works to determine deterrence: the immediacy, or celerity, with which the crime is detected and the punishment meted out. The above studies generally find that both certainty and celerity have a greater impact on deterrence than severity.

It is not clear why certainty is so much more effective than severity at deterring criminal behavior; as is the case in many contexts, empirical studies can identify the "what" but not the "why." It is even less clear why celerity plays any role in a potential criminal's decision. The Court suspects that the average street-level potential criminal is more well-informed about the likelihood of getting caught, and the quickness with which he will be caught, than he is about the sentence he will receive. From there, the potential criminal uses the information he has on hand to make his decision, and largely disregards the impact of severity, rather than trying to seek out specific information. Drug trafficking defendants, aliens returning after being deported, and Indians off the reservation are often shocked at the severity of federal sentences as compared to prior sentences they may have received in state and tribal systems; in the Court's experience, most federal defendants have no idea how harsh federal sentences are, which would obviously prevent them from acting as an effective deterrent.

What is clear, however, is that severity of punishment continues to have some deterrent effect -- albeit less than it would were the universe of potential criminals an overall rational bunch. See, e.g., Daniel S. Nagin, Deterrence: A Review of the Evidence by a Criminologist for Economists, 2013 Annual Rev. Econ. 5:83, 86-88, 97-98 (2013). It also seems likely that the behavior of sophisticated potential criminals would hew more closely to the economic model than that of unsophisticated, street-level criminals. Thus, general deterrence remains an important consideration in cases like this one, in which the perpetrators are relatively sophisticated and the certainty of detection relatively low -- and the celerity even lower.

United States v. Courtney, No. CR 11-2860-001 JB, 2014 WL 7472975, at *32 n.13 (D.N.M. Dec. 15, 2014)(Browning, J.).

A Guidelines sentence will have a greater deterrent effect than the sentence Luna-Jasso requests, even if the greatest deterrence is the certainty of being caught. Accordingly, the deterrent effect calls for a Guidelines sentence. Moreover, other § 3553(a) factors -- the seriousness of the crime, i.e., the seriousness of committing violent crimes and then illegally returning to the United States; the need to protect respect for the law for a person who has been convicted twice, arrested nine times, and deported from the United States three times; the need to protect the public from a person who gets drunk and commits serious crimes; and the need to avoid unwarranted sentencing disparities between similarly situated defendants -- also call for a Guidelines sentence.

## III.   THE COURT WILL SENTENCE LUNA-JASSO TO THE LOW END OF THE GUIDELINES RANGE.

The Court will sentence Luna-Jasso to the low end of the Guidelines range. For the reasons stated on the record, the Court will sentence Luna-Jasso to 18-months imprisonment. Unless there are particularly aggravating circumstances, which are not present here, the Court usually sentences at the low end of the range unless it decides to vary.

**IT IS ORDERED** that Defendant Alberto Luna-Jasso is sentenced to 18-months imprisonment.

_____
UNITED STATES DISTRICT JUDGE

_Counsel:_

Damon P. Martinez
  United States Attorney
Presiliano Torrez
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

      _Attorneys for the Plaintiff_

Stephen P. McCue
  Federal Public Defender
Kari Converse
   Assistant Federal Public Defender
Albuquerque, New Mexico

      _Attorneys for the Defendant_